UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PENNY D. HILLA,

                Plaintiff,                CIVIL ACTION NO. 08-11633

    vs.

                                    DISTRICT JUDGE ARTHUR J. TARNOW

COMMISSIONER OF                MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION**

**I.**    **RECOMMENDATION:**    This Court recommends that Defendant's Motion for Summary Judgment (docket no. 15) be DENIED, Plaintiff's Motion for Summary Judgment (docket no. 11, 17) be DENIED, and the instant case REMANDED as set forth herein.

\*\*\*

**II.**    **PROCEDURAL HISTORY:**

Plaintiff filed an application for a period of disability and Disability Insurance Benefits on December 13, 2005, alleging that she had been disabled since September 20, 2004 due to reflex sympathetic dystrophy in her foot, poor eyesight, side effects from medication, lack of movement in the toes on her left foot, a left calf smaller than the right and deafness in her right ear. (TR 44-48, 73, 76-77). The Social Security Administration denied benefits. (TR 36-40). A requested de novo hearing was held on July 10, 2007 before Administrative Law Judge (ALJ) J. Thomas McGovern who subsequently found that the claimant was not entitled to a period of disability or Disability Insurance Benefits because she was not under a disability at any time from September 20, 2004

through the date of the ALJ's August 27, 2007 decision.  (TR 15, 23, 245, 247).  The Appeals Council declined to review the ALJ's decision and Plaintiff commenced the instant action for judicial review.  (TR 4-6).  The parties filed Motions for Summary Judgment and the issue for review is whether Defendant's denial of benefits was supported by substantial evidence on the record.

### III.  PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE AND VOCATIONAL EXPERT TESTIMONY

#### A.  Plaintiff's Testimony

Plaintiff was forty-eight years old at the time of the administrative hearing.  (TR 250). Plaintiff has a high school education, one and one-half years of college education and past work experience as an inspector and machine operator in a plastics factory.  (TR 250-51).  Plaintiff has not worked since 2004 when she had foot surgery to remove a neuroma from the bottom of her left foot, following a work-related accident where a hi-lo ran over her foot.  (TR 252-53).

Plaintiff complains of a constant burning pain in her left foot which she rates as an eight and a half on a scale of ten and normally rates at a nine to ten.  (TR 253).  Plaintiff testified that the pain worsens with being on her feet and before her medications are due.  (TR 253).  Plaintiff also complained of pain in the lower back and left hip.  (TR 255).  For pain, Plaintiff takes MS Contin (morphine) 45 mg., three times per day and Vicodin, 500 mg., three times a day or as needed.  (TR 253-54).  She testified that she also takes Clonazepam, Cymbalta and Trazodone.  (TR 253). Plaintiff has problems with her balance and testified that her foot gives out if she tries to put weight on it.  (TR 266).  Plaintiff uses a cane to walk and stand and testified that with the cane she can stand for twenty minutes while shifting position before she sits down and elevates her foot.  (TR 251, 255-56).  She testified that she can walk about 100 feet with her cane and only ten feet without her cane

2

before she has to "fall over." (TR 268). Plaintiff wears an orthotic sock and shoes and testified that she has excruciating pain when she puts them on. (TR 267). She testified that she can sit for a couple of minutes before she has to change positions and she elevates her foot off and on all day to waist height. (TR 256). Plaintiff uses her right arm for her cane and limits herself to carrying her purse on her left arm. (TR 256). She testified that she cannot carry a pan of water across the room to the stove. (TR 256). If she has to use stairs, she crawls up them. (TR 257). She watches television and sleeps off and on all day. (TR 257). If she does the dishes, it takes her all day and she can do one load of laundry per day. (TR 258). She does not cook meals but she helps her fiancé prepare meals, for example, by peeling potatoes. (TR 258). Plaintiff testified that she uses the computer for about twenty minutes two times per week and crochets for twenty minutes to one half hour at a time. (TR 259). Plaintiff drives short distances and does not take morphine before she drives. (TR 262). Plaintiff grocery shops with her fiancé once per week and buys small items on her own. (TR 263). She goes out to dinner occasionally. (TR 263). She testified that since her accident she has not been able to participate in dancing, walking, snowmobiling, water skiing and riding dirt bikes and four-wheelers. (TR 266).

Plaintiff testified that she experiences depression but she does not treat with anyone. (TR 264). She testified that her medications slow her down and she is able to pay attention for twenty minutes to an hour. (TR 254, 267). Plaintiff testified that she has difficulty hearing from her right ear. (TR 269). She testified that she had the hearing loss while she was working in the factory, yet she did not feel that it affected her ability to perform that job. (TR 269).

### B.    Medical Record

Plaintiff's foot was run over by a hi-lo at work in May 2004. (TR 111, 115). Following the accident, Plaintiff treated with Thomas C. Hosey, D.P.M., and Dr. J. Stevelinck. (TR 94-115). Dr.

3

Hosey noted a contusion on the left foot and trauma at the 3rd, 4th and 5th metatarsal phalangeal joint. (TR 110, 112). On May 27, 2004 Gregg Branham, D.O., diagnosed fracture of the distal phalanx of the small toe and recommended that Plaintiff modify her activity to sitting one hundred percent of the time, no squatting or kneeling, sitting and standing as needed for pain, ground level work only and no climbing ladders, using crutches one hundred percent of the time, applying ice to the area three times per day for fifteen minutes each time, performing calf stretching exercises and elevating the left foot as much as possible. (TR 199).

As of June 18, 2004 Dr. Hosey noted that Plaintiff was not on any restrictions and could go about her business as "normal." (TR 103). On June 25, 2004 Dr. Hosey noted that Plaintiff seemed to be improving and Plaintiff reported that she was working full-time. (TR 110). In July 2004, however, Plaintiff continued to report discomfort and was awaiting completion of an orthotic. (TR 108). An August 30, 2004 MRI revealed a cyst or neuroma between the 2nd and 3rd metatarsals of the left foot and on September 20, 2004 Plaintiff underwent excision of the neuroma at the 2nd inter-metatarsal space of the left foot with Thomas Hosey, D.P.M. (TR 100-04, 133). In September 2004 Plaintiff reported discomfort and Dr. Hosey noted that she was unable to work until October 12, 2004. (TR 97-99). On October 11, 2004 Dr. Hosey noted that Plaintiff reported some discomfort in the left foot "if she is on it for a while" and advised another month off work. (TR 94). He noted she was "healing within normal limits" and was advised to "continue wearing good, padded shoes." (TR 94).

Plaintiff treated with Frank S. Pollina, M.D., Physical Medicine and Rehabilitation, at Great Lakes Physiatrists, P.C., from November 17, 2004 through August 29, 2006. (TR 146-57, 188-95). Dr. Pollina noted that on examination Plaintiff walked "with minimal weight on her left foot" and had discoloration of the left second and third toe and great difficulty moving them. (TR 157).

Plaintiff had hyperesthesias to even light touch in a number of areas along the foot, but primarily the tibial nerve distribution and had markedly positive Tinel's sign over the left tarsal tunnel. (TR 157). She was "able to dorsiflex and plantar flex the foot without great difficulty." (TR 157). Dr. Pollina diagnosed causalgic pain in the left foot which appeared to be a peripheral neuropathy and prescribed Neurontin. (TR 157). Electromyographic testing on November 24, 2004 revealed no evidence of tarsal tunnel syndrome. (TR 156). On December 9, 2004, Dr. Pollina noted that the Neurontin was "not of any benefit" and Plaintiff was unable to tolerate an increase in the dosage. (TR 155). Plaintiff complained of shooting pain, numbness, burning and tingling in the foot. (TR 155). Dr. Pollina prescribed Ultram for pain. (TR 155).

On January 5, 2005 Plaintiff was examined by Michael G. Sperl, M.D., who reported that Plaintiff was using crutches at the examination, had an antalgic left gelled gait and was only partial weight bearing on the left side. (TR 118). Plaintiff complained of coolness of the left foot, extreme hypersensitivity, numbness, tingling, and intolerance for any pressure and/or compression. (TR 118). Dr. Sperl agreed with Dr. Pollina's diagnosis of RSD. (TR 119). He concluded that Plaintiff "is limited in terms of return to work. . . . she would basically have to function at a sedentary type job, minimizing any type of standing or walking activities." (TR 119). He noted that restrictions, treatment and follow-up should be continued for an additional eight to ten weeks, subject to additional testing if warranted at that time. (TR 119).

On January 25, 2005 Dr. Pollina noted that Plaintiff seemed to be doing better and had a sympathetic nerve block, although the doctor was not sure it was helpful. (TR 154). He noted that Plaintiff would continue her physical therapy and was continuing to use crutches. (TR 154-55). On February 28, 2005 Dr. Pollina noted that Plaintiff was "basically doing the same," she reported the burning had subsided a "little bit" and she thought the sympathetic block may have been a slight

5

help.  (TR 153).  Dr. Pollina noted that she had minimal movement in the 2nd to 5th toes on the left foot and definite discoloration.  He diagnosed Plaintiff with reflex sympathetic disorder and noted that Dr. John Pollina and Dr. Joseph P. Femminineo both took "a look" and agreed with the diagnosis.  (TR 153).  Dr. Pollina prescribed a Medrol Dosepak and Gabitril and reordered Vicodin for pain.  (TR 153). He encouraged Plaintiff to "be active and stay on her home program."  (TR 153).

In March 2005 the doctor noted that Plaintiff was unable to tolerate the Gabitril due to diarrhea and there were insurance issues with obtaining more of the medication.  (TR 152).  On April 14, 2005 Plaintiff reported that she thought that a sympathetic nerve block which she had the prior week had "made things worse" throughout her left leg.  (TR 151).  Dr. Pollina noted some progress because Plaintiff could walk without crutches, wear compression stockings on the left leg and remove them without severe pain, and put on a shoe.  (TR 151).  She continued to report significant pain with any motion in the second and third toes.  (TR 151).

Plaintiff was evaluated at Michigan Neurology Institute by Boris J. Leheta, M.D., on May 19, 2005. (TR 122-25).  Dr. Leheta noted that Plaintiff reported pain that progressed up her foot and into her ankle and claimed she was unable to sleep due to "the pain and burning dysesthesias that she experiences."  (TR 122). Dr. Leheta reported that Plaintiff had a narrow based gait and toe walking, heel walking and tandem walking were normal.  (TR 124).  The doctor suggested a trial of Cymbalta 60 mg. per day for her neuropathic pain and referred her to University of Michigan for further management and treatment.  (TR 125).

In May 2005 Dr. Pollina noted no discoloration of the toes and good range of motion in the ankle, but continued extreme sensitivity to even very light touching of the second through fifth toes. (TR 150).  The doctor noted that Plaintiff has "continued her physical therapy," "continues to be

disabled," and "continues to take about three tablets of Vicodin a day." (TR 150). The doctor encourage her not to use the crutches and to do "everything she can" to move the toes. (TR 150). Plaintiff admitted that she was "much better than she was a few months ago when the ankle was involved." (TR 150).

Plaintiff was examined by Sharon Poisson, M.D., on August 16, 2005 at the University of Michigan Department of Neurology. (TR 127-29). Plaintiff reported constant pain rated at a 7 on a scale of 10. (TR 127). Dr. Poisson noted 5/5 muscle strength in the upper and lower extremities. (TR 128). Plaintiff had limited range of motion in toe flexion of the left foot and discomfort with bending the toes. (TR 128). On sensory exam, Plaintiff reported a burning sensation when touched on the distal one-half of her left foot with either light or sharp touch. (TR 128). Both feet felt cool and about the same temperature. (TR 128). The doctor noted a slight purple discoloration of the left foot and decreased muscle mass in the left calf, with normal tone throughout. (TR 128). Plaintiff walked on the heel of her left foot with a limp towards the right. (TR 128). The doctor reported that she did not have Plaintiff perform toe or tandem walking due to hypersensitivity of the left foot. (TR 128). Dr. Poisson noted that Plaintiff's story was consistent with complex regional pain syndrome (formerly called reflex sympathetic dystrophy). (TR 129). Dr. Poisson prescribed amitriptyline tablets and noted that Plaintiff would likely benefit from continued physical therapy. (TR 129).

In October 2005 Plaintiff reported that Elavil was "not of any real help" and the doctor prescribed Lyrica. (TR 148). Plaintiff had some discoloration of the second and third toe, good range of motion in the ankle and "pretty good range of motion of her big toe." (TR 148). Dr. Pollina used fluoromethane spray on the second and third toes and Plaintiff was able to move them "a little more." (TR 148). The doctor noted that Plaintiff seemed reluctant to move her toes due to

7

pain, and he reinforced with her that he believed she would not "get any better unless she is able to do this." (TR 148). In November 2005 Dr. Pollina noted that Plaintiff discontinued Lyrica because she was unable to tolerate it. (TR 147). He again emphasized the need to force movement of the toes as much as possible. (TR 147). A December 13, 2005 MRI revealed mild degenerative changes of the left foot and a distinct abnormality was not identified. (TR 131).

In January 2006 Dr. Pollina reported that Plaintiff continues with the symptoms of complex regional pain syndrome and had made no real progress since the prior examination. (TR 146). Plaintiff was continuing with physical therapy. (TR 146). The therapist had started working on the second and third toes, but Plaintiff was not following up with any movement of the toes at home, due to pain. (TR 146). Dr. Pollina noted that "Penny continues totally disabled at this time" and he was going to follow-up with the University of Michigan Neurology Department's recommendation that Plaintiff be seen at the University of Michigan Pain Clinic. (TR 146).

On January 30, 2006 Plaintiff was examined by Nagem Haider, M.D., at the University of Michigan Center for Interventional Pain Medicine. (TR 176-78). Dr. Haider noted that Plaintiff reported minimal relief from physical therapy but she reported rarely performing the exercises at home due to pain. (TR 177). Plaintiff was able to heel walk but could not toe walk due to pain. (TR 177). Plaintiff had full range of movement in the left foot. (TR 177). The doctor recommended trying Pregabalin again and starting nortriptyline and methadone. (TR 177).

On March 3, 2006 Plaintiff underwent a state agency consultative examination with E. Montasir, M.D., who reported that Plaintiff uses a cane for weight bearing on the left lower extremity, was unable to mobilize for more than two or three steps without it and can stand only a few minutes without it. (TR 158-60). Plaintiff's gait was "significantly antalgic." (TR 160). Plaintiff had significant hyperthesia and was very sensitive to touching or palpating the left foot.

(TR 160).  Squatting was "not possible" and there was no heel to toe or tiptoe walking.  (TR 160).

The doctor noted that "patient requires the cane . . . for ambulation."  (TR 160).  Plaintiff had

significant weakness in the left leg and difficulty using it.  (TR 159).  Dr. Montasir noted that

Plaintiff's left leg circumference was 1 ½ inches smaller than the right leg, with obvious wasting of

the calf muscles.  (TR 159-60).  Plaintiff reported reduced hearing in her right ear since childhood

and normal hearing in her left ear.  (TR 159).  She has a hearing aid but does not use it.  (TR 159).

Tuning fork testing revealed "lateralization towards the right ear indicating some of the air

conduction loss" but Plaintiff could hear conversational level sounds reasonably well.  (TR 159).

    A Physical Residual Functional Capacity Assessment was completed on March 16, 2006 by

agency medical consultant Joh William, who concluded that Plaintiff has the ability to occasionally

lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk

about six hours of an eight-hour workday, sit about six hours of an eight-hour workday, and is

unlimited in ability to push and/or pull, including the use of hand and/or foot controls except as

limited with lifting and carrying, and has no postural limitations.  (TR 165).  The consultant

concluded that the diagnosis of regional pain syndrome by the neurologist was "based exclusively

on symptoms of intractable pain complaints of left foot" and physical examination was normal

except for the difference in calf size, which he noted was "questionable in significance from (sic)

neurological point of view, much less in relation to current allegation since there is no dystrophic

change in the foot."  (TR 165).  The consultant noted that "[m]ultiple neuromuscular exam (sic)

including CE have not shown objective mer to support use of cane to walk and allegation of constant

excruciating pain."  (TR 165).

    On April 5, 2006 Allan M. Grant, M.D., reported that plaintiff has definite hypersensitivity

of the left foot and no adequate pain control.  (TR 179).  Dr. Grant noted a "definite color change

from the midfoot down and no temperature change.  Her nails are growing in in (sic) a curved fashion abnormally as compared to the right and her toes are swollen." (TR 179).  He concluded that Plaintiff "does not have any concerns of an orthopaedic nature at this point in time and will return as needed." (TR 179).

On June 1, 2006 Dr. Pollina noted that Plaintiff was taking four Vicodin and three Ultram per day, ordered that Plaintiff "[c]ontinue disabled for 3 months" and prescribed "psych counseling." (TR 190).  A June 6, 2006 physical therapy treatment summary reports that Plaintiff had attended physical therapy two to three times a week since January 2005.  (TR 180-81).  The therapist noted that Plaintiff was "'functional' but marginally so," needs frequent rest periods, has hypersensitivity to touch in the vicinity of the second and third metatarsal head and has developed contracture of the left great toe flexor tendon due to her inability to place the entire foot flat for ambulation.  (TR 180).  The therapist noted that progress in mobility with a cane had "plateaued" and that her altered gait pattern had resulted in chronic pain in both hips and knees.  (TR 180).

On July 7, 2006 Mary K. Kneiser, M.D., performed an independent medical evaluation and noted atrophy of the left calf, measuring 30.5 cm compared to the right calf, measuring 34 cm, and "allodynia and slight purplish erythematous hue to the left foot in mottled pattern." (TR 185).  Dr. Kneiser stated that Plaintiff has not been compliant with her home exercise program and that recovery was dependent on Plaintiff's active exercise, not passive treatments, "so the way to get better is actually to work through pain at this point and perhaps take higher doses of medications to allow the individual to do that." (TR 187).  The doctor concluded that Plaintiff is "capable of performing sedentary work." (TR 187).  On August 29, 2006 Dr. Pollina prescribed Cymbalta and Klonopin and ordered Plaintiff to "Continue Disabled for 6 months." (TR 188, 189).

Plaintiff underwent a psychological evaluation with Michael Vredevoogd, Ph.D., on October

10

2, 2006.  (TR 202-03).  Plaintiff reported her physical pain at an 8 on a scale of 10.  Dr. Vredevoogd concluded that Plaintiff was highly depressed and agitated about her current physical problems and diagnosed Adjustment Disorder with Mixed Emotional Features (309.28).  (TR 203).

Plaintiff treated at Tri-County Pain Consultants, P.C., from May 22, 2006 through April 19, 2007.  (TR 216-244).  In May 2006 Siva Sripada, D.O., discussed with Plaintiff the use of low dose opioids to manage her pain, including Methadone.  (TR 244).  In October 2006 Siva Sripada, D.O., noted that Plaintiff underwent a left-sided paravertebral lumbar sympathetic block after which Plaintiff reported very little pain relief.  (TR 239).  In January 2007 the treatment provider noted that Plaintiff had severe drowsiness and moderate mental fogginess.  (TR 226).  Plaintiff's methadone was increased to 5 mg. three times per day, Norco was discontinued and Plaintiff was given Vicodin.  (TR 226).  Her Klonopin was increased and she was also prescribe Provigil.  (TR 226).  It was noted that Plaintiff ambulated with a cane and the treatment provider discussed the possibility of using a spinal cord stimulator.  (TR 226).  In February 2007 it was again noted that Plaintiff still had drowsiness and mental fogginess but Plaintiff reported that it was "much improved" with the Provigil and having switched to Duragesic.  (TR 220).  In April 2007 the treatment provider noted that Plaintiff complained of constant pain across her back and down her leg, which she rated at a 9 on a scale of 10.  (TR 216).  Plaintiff was continued on Kadian, Vicodin, Klonopin and Provigil and needed to obtain clearance from a psychologist to use a spinal cord stimulator.  (TR 216).

### C.    Vocational Expert

The Vocational Expert (VE) classified Plaintiff's past relevant work in inspection and machine operating in a plastics factory as unskilled and light in exertion.  (TR 271).  The ALJ asked the VE to consider an individual of Plaintiff's age, education and work experience, with the ability to lift no greater than ten pounds regularly and continually, sit for 30 minutes, stand for 30 minutes

with a sit/stand option, no postural activities, requiring the use of a cane in the dominant hand for standing and walking, and no unprotected heights, machine operation or hazards. (TR 271). The VE testified that such an individual would not be able to perform Plaintiff's past relevant work. (TR 271). The VE further testified that "unskilled sedentary work would not necessarily be contraindicated" and this would include simple forms of bench assembly (6,000-7,000 jobs in southeastern Michigan), bench packaging (4,000 jobs) or bench inspecting (2,500 jobs). (TR 271). The VE further testified that the individual's need to elevate the left foot to chair height off and on throughout the day or the need for unscheduled rest breaks as a result of pain would eliminate the availability of these jobs. (TR 272). The VE responded to the ALJ's question that his testimony is consistent with the Dictionary of Occupational Titles. (TR 272).

## IV.   ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that although Plaintiff met the disability insured status requirements through the December 31, 2009, had not engaged in substantial gainful activity since September 20, 2004 and suffered from complex regional pain syndrome of the left lower extremity, a severe impairment, she does not have an impairment or combination of impairments that meets or equals the Listing of Impairments. (TR 17-18). The ALJ found that Plaintiff's statements regarding her limitations were not totally credible and although she could not perform her past work as an inspector and machine operator in plastics, she has the ability to perform a limited range of sedentary work and there are jobs that exist in significant numbers in the economy that Plaintiff can perform. (TR 21-22). Therefore, she is not suffering from a disability under the Social Security Act. (TR 23).

## V.   LAW AND ANALYSIS

### A.   Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's

final decisions.  Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528.  It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility.  *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole.  *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion.  *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### B.      Framework for Social Security Determinations

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis.  In the first four steps, Plaintiff was required to show that:

(1)      she was not presently engaged in substantial gainful employment; and

(2)      she suffered from a severe impairment; and

13

(3)     the impairment met or was medically equal to a "listed impairment;" or

(4)     she did not have the residual functional capacity to perform her relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(f).  If Plaintiff's impairments prevented her from doing her past work, the Commissioner, at step five, would consider her RFC, age, education and past work experience to determine if she could perform other work.  If she could not, she would be deemed disabled.  *See* § 404.1520(g).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform."  *Her*, 203 F.3d at 391.  To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs."  *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987).  This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'"  *Id.* (citations omitted).

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ did not properly assess Plaintiff's credibility and failed to consider a number of treating physicians' opinions that Plaintiff was disabled.  Plaintiff also argues that the ALJ misconstrued testimony of the VE which would have precluded a finding that Plaintiff could perform jobs in the economy.

### C.     Analysis

### 1.     *Whether The ALJ's Determination Of Plaintiff's Credibility Is Supported By Substantial Evidence*.

Plaintiff argues that the ALJ did not properly assess her credibility and testimony in light of the medical records.  (Docket no. 11).  "[A]n ALJ's findings based on the credibility of the applicant

14

are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters,* 127 F.3d at 531.  Credibility assessments are not insulated from judicial review.  Despite deference due, such a determination must nevertheless be supported by substantial evidence.  *Id.*  An ALJ's credibility determination must contain "specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p.

Furthermore, to the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements."  20 C.F.R. § 404.1529(c)(2).  In addition to objective medical evidence, the ALJ must consider all the evidence of record in making his credibility determination.  *See* 20 C.F.R. § 404.1529(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994).

Plaintiff alleges that the ALJ's statement that "[m]ultiple neuromuscular examinations including the consultative examination have not shown objective medical evidence to support the use of a cane to walk or claimant's allegations of constant excruciating pain" is not supported by the record.  (Docket no. 11 and TR 21).  Plaintiff argues that the record contains substantial evidence that Plaintiff must use a cane and suffered excruciating pain.  Plaintiff also argues that the ALJ disregarded Dr. Pollina's opinion that Plaintiff is "disabled."  (TR 146, 189).  With respect to the cane, the ALJ included the use of a cane in the RFC, so the ALJ must have found substantial evidence supporting this limitation.

15

The Court finds that the ALJ's credibility determination as set forth in his decision is not supported by substantial evidence and does not consider the factors set forth in 20 C.F.R. § 404.1529(c)(3). The ALJ stated with respect to the credibility determination that Plaintiff was diagnosed with RSD "by a neurologist based exclusively on symptoms of intractable pain complaints of the left foot" and that "[m]ultiple neuromuscular examinations including the consultative examination have not shown objective medical evidence to support the use of a cane to walk or claimant's allegations of constant excruciating pain." (TR 21). These statements and the related statements contained in the fifth paragraph on page 7 of the ALJ's decision parrot the state agency medical consultant's summary of facts dated March 16, 2006. (TR 21, 165). The ALJ relies on this medical consultant's summary as substantial evidence supporting his credibility determination. In the same decision, two paragraphs later, the ALJ "gives little weight" to the same March 16, 2006 state agency medical opinion because the evidence received at the hearing "shows that the claimant is more limited than determined by the State agency consultant" and the "consultant did not adequately consider the claimant's subjective complaints or the combined effect of the claimant's impairments." (TR 21). The ALJ has not explained the reason for adopting the consultant's March 16, 2006 summary over the treating physicians' opinions and records in making the credibility determination.

No treatment provider disputes the diagnosis of RSD and several providers made the diagnosis, expressly concurred in it, or noted that Plaintiff's symptoms were consistent with it, including Dr. Pollina, Dr. Sperl and Dr. Poisson. (TR 119, 129, 153 ). Dr. Kneiser noted that Plaintiff "has evidence supporting the diagnosis of Reflex Sympathetic Disorder." (TR 186). The record also includes evidence of changes in the skin color of the left foot, which is a clinically documented sign of RSD and Complex Regional Pain Syndrome. (TR 128, 153, 157, 179, 185).

16

*See* SSR 03-2p, 2003 WL 22399117.

It is well settled that the opinions and diagnoses of treating physicians are generally accorded substantial deference. Under 20 C.F.R. § 404.1527(d)(2), the ALJ must give a treating physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. The Sixth Circuit has stated that "[i]n general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters*, 127 F.3d at 529-30.

If an ALJ rejects a treating physician's opinion, he must "give good reasons" for doing so in his written opinion. *See* 20 C.F.R. 404.1527(d)(2); *see also* SSR 96-5p and 96-2p. Furthermore, the Sixth Circuit has noted that the ALJ must provide good reasons for the weight given a treating source's opinion. *Wilson v. Comm'r of Social Sec'ty*, 378 F.3d 541, 544 (6th Cir. 2004). The reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (*citing* SSR 96-2p, 1996 WL 374188, at *5).

As set forth above with respect to the credibility determination, to the extent the ALJ has adopted the summary of facts as set forth by the medical consultant, the ALJ has not provided the required explanation of the weight given to the treating physicians' reports and opinions regarding Plaintiff's pain and objective symptoms and findings related to her RSD and pain. With respect to Dr. Pollina's reports that Plaintiff was "disabled," the ALJ "is not required to accept a treating physician's conclusory opinion on the ultimate issue of disability." *Maple v. Commissioner of Social Security*, 14 Fed. Appx. 525, 536 (6th Cir. 2001); *see also* 20 C.F.R. § 404.1527(e). However, these opinions must not be disregarded. SSR 96-5p, 1996 WL 374183. There is no

17

evidence that the ALJ considered these opinions and the ALJ's references to Dr. Pollina's notes are limited and do not reference the doctor's reports of Plaintiff's pain, use of a cane and objective evidence of discoloration of the foot. *See* SSR 03-2p, 2003 WL 22399117. Without a more detailed explanation of any alleged inconsistencies in the record, the Court cannot adequately trace the logic of the ALJ's decision-making and therefore cannot determine whether the ALJ's rejection of treating physicians' opinions in favor of the consultant's March 16, 2006 opinion and summary was proper. *See Ivy v. Sec'y of Health & Human Servs.*, 976 F.2d 288, 289 (6th Cir.1992) (a reviewing court "should not be left to guess as to the . . . reasons for granting [or denying] relief.").

In addition to objective medical evidence, the ALJ must consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than medication, for pain relief, (6) any measures used to relieve the pain, and (7) functional limitations and restrictions due to the pain. *See* 20 C.F.R. § 404.1529(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994) (applying these factors). The ALJ considered and referenced Plaintiff's ability to perform daily activities, however, the ALJ does not explain where he finds conflict between the extent to which she testified that she engages in these activities and her testimony regarding the limiting effects of her symptoms. Plaintiff's report from January 2006 and her testimony at the 2007 hearing were consistent in her allegations that she does very little shopping, she only goes out or drives when she has to, such as for doctors appointments, and she does not cook meals but she assists her fiancé when he makes meals. In January 2006 she reported that she makes sandwiches or other "quick" meals and she prepares food or meals only once a month. (TR 67). In January 2006 she reported that bathing was "difficult" and at the hearing she testified that it was "dangerous." (TR 258). The

18

ALJ has not shown a conflict between these limited activities and the Plaintiff's statements regarding the extent of her pain or the need to elevate her leg to waist height.

The ALJ did not discuss the other information submitted about Plaintiff's symptoms including the location, duration, frequency, and intensity of claimant's pain. Many of Plaintiff's treatment providers and consultants from November 17, 2004 through July 2006 noted throughout their examination reports that Plaintiff was hypersensitive or had tenderness to touch on the left foot, including Dr. Pollina, Dr. Montasir, Dr. Poisson, Dr. Haider, Dr. Grant, and Dr. Kneiser. (TR 128, 150, 157, 160, 177, 179, 185-86). Plaintiff's complaints of pain were consistent in both intensity and nature throughout the same time frame. (TR 127-28, 151, 155, 157, 176, 179, 183, 242).

The ALJ did not address evidence regarding the type, dosage, effectiveness, and side effects of Plaintiff's pain medication. Plaintiff was seen at two pain clinics and the record is replete with notes from Plaintiff's treatment providers regarding the variety of medication which has been prescribed and was not tolerated or was ineffective. Dr. Haider listed the following medications which have been tried in the past: amitriptyline, Celexa, Neurontin, Lyrica, Elavil, Cymbalta, and codeine. (TR 177). Plaintiff has used an opioid, methadone, and most recently the record shows that she was taking Kadian, one Vicodin 5/500 every six hours prn, Klonopin, and Provigil. (TR 216). Dr. Sripada recommended use of a spinal cord stimulator and the most recent records show that Plaintiff was advised to obtain the necessary psychological evaluation to use this method for pain relief. (TR 216, 244). The record also supports Plaintiff's allegations that the medications make her "slow." (TR 254, 267). The treatment provider noted "mental fogginess" in February and April 2007. (TR 216, 220).

In his credibility determination the ALJ relies on 20 C.F.R. § 404.1530(a) for the premise that "[I]n order to get benefits, [a claimant] must follow treatment prescribed by [her] physician if

this treatment can restore [her] ability to work." (TR 21). To the extent that the ALJ is relying on Plaintiff's failure to follow a home exercise program to find Plaintiff is not disabled, he must make findings of fact on this issue. "In order for an impairment that would otherwise produce a finding of disability to be declared treatable, there must be a factual basis and findings of fact on the issue. The Secretary must show that the disability is clearly treatable." *Johnson v. Secretary of Health and Human Services*, 794 F.2d 1106, 1113 (6th Cir. 1986).

Furthermore, although the ALJ pointed out that Dr. Kneiser noted that Plaintiff "needs to participate in an active home exercise program in order to halt the pain cycle associated with RSD" Dr. Kneiser also stated that Plaintiff may "need to take higher doses of medication to allow" her to work through the pain. (TR 21, 187). On appeal Plaintiff alleges that her insurance would not cover the "requisite equipment necessary for her to follow up with her assigned home exercise program until August, 2007." (Docket no. 11). While it is unclear what equipment is at issue in Plaintiff's statement because Plaintiff has not referenced the transcript, the record does show that there were issues regarding insurance coverage for certain recommended medications and that Plaintiff was intolerant of several medications which were prescribed for her pain management. Plaintiff consistently reported that she was not following her home exercise program because the resulting pain was intolerable. (TR 146, 148, 177). The ALJ did not address Plaintiff's reason for failing to follow this treatment. (TR 21). The record contains unrefuted evidence from several of Plaintiff's treatment providers that anti-pain and other medication was contraindicated because of Plaintiff's intolerance for the side-effects. (TR 147, 148, 155, 177, 226, 239).

There is no evidence in the ALJ's opinion that he considered these factors with respect to Plaintiff's specific statements. The credibility of Plaintiff's statements has significant ramifications. The VE testified that if Plaintiff needed to elevate her foot to chair height or take unscheduled rest

breaks, then Plaintiff could not perform her past relevant work or any other competitive employment. (Tr. 220). Based upon the foregoing, the Court concludes that substantial evidence does not support the ALJ's credibility assessment. Therefore, the case must be remanded so that the ALJ may conduct a re-assessment of Plaintiff's credibility, specifically citing to the facts that support his or her determination including which of Plaintiff's claims are or are not credited and the evidentiary basis for his or her conclusions. Thereafter, the ALJ should: (1) specifically state whether Plaintiff's credible complaints affect his or her RFC finding and the reasons for those decisions; and (2) conduct a new step four analysis if otherwise appropriate and proceed to a step five analysis if necessary. Based upon the foregoing, the Court concludes that substantial evidence does not support the ALJ's credibility assessment.

## 2.    *VE Testimony*

Finally, Plaintiff argues that the ALJ misconstrued testimony of the VE which would have precluded a finding that Plaintiff could perform jobs in the economy. In a hypothetical question posed to the VE, an ALJ is required to incorporate only those limitations which he finds credible and supported by the record. *See Casey v. Sec'y of Health and Human Servs.,* 987 F.2d 1230, 1235 (6th Cir. 1993). Because the ALJ's credibility finding is not supported by substantial evidence, the Court cannot determine whether the hypothetical question to the VE incorporated all of Plaintiff's limitations. To the extent Plaintiff argues that the ALJ misconstrued the VE's testimony that "unskilled sedentary work would not necessarily be contradicted" by the limitations set forth in the ALJ's first hypothetical, the Court does not find that the VE's statement precludes work. The VE testified to jobs in the economy and the numbers in which they exist to show that there were at least three types of work which Plaintiff could perform. (TR 271).

## VI.    CONCLUSION

The Commissioner's decision is not supported by substantial evidence.  Defendant's Motion for Summary Judgment (docket no. 15) should be DENIED.  Plaintiff's Motion for Summary Judgment (docket nos. 11, 17) should be DENIED.  The case should be REMANDED back to the Commissioner for further proceedings consistent with this Report.

## REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: May 08, 2009                         s/ Mona K. Majzoub
                                            MONA K. MAJZOUB
                                            UNITED STATES MAGISTRATE JUDGE

22

**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.


Dated: May 08, 2009             s/ Lisa C. Bartlett
                                Courtroom Deputy